Case Nos. 21-3784/22-3215

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 09, 2023
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| CHRISTIAN ANTONIO ROSALES-RIVERA; JESSICA MICHELLE VILLALTA-PEREZ, | ) ) ) |
| Petitioners, | ) ) |
| v. | ) ) ) |
| MERRICK B. GARLAND, Attorney General, | ) ) |
| Respondent. | ) ) |

ON PETITIONS FOR REVIEW FROM THE BOARD OF IMMIGRATION APPEALS

OPINION

Before: SILER, COLE, and NALBANDIAN, Circuit Judges.

**NALBANDIAN, Circuit Judge.** Christian Rosales-Rivera and Jessica Villalta-Perez ("Petitioners") are native Salvadorans who ran into serious problems with the gang, MS-13. And as a result, Petitioners left El Salvador. They entered the United States and applied for asylum, withholding of removal, and Convention Against Torture ("CAT") protection.

An immigration judge ("IJ") denied the applications because, among other things, Petitioners failed to prove that the Salvadoran government was unwilling or unable to protect them from MS-13. The Board of Immigration Appeals ("BIA") agreed. And later, the BIA denied the couple's motion to reconsider its determination. Petitioners now appeal the BIA's initial order affirming the IJ's denial of their applications and the BIA's denial of their motion for reconsideration. Because substantial evidence supports the IJ and BIA's determinations, we deny the petitions for review.

# I.

Petitioners Christian Rosales-Rivera and Jessica Villalta-Perez are married Salvadoran citizens. The IJ adopted Christian's credible testimony as the factual findings. So we recount the facts largely as they were testified.

In 2014, Christian and a family friend named Ivan visited Jessica at her home in El Salvador on Christmas Eve. Ten MS-13 gang members—armed with several weapons—asked Christian and Ivan for their IDs and where they lived. But conversation stopped when a car with broad headlights drove by. The gang members ran away, and Christian and Ivan entered Jessica's home.

Soon after, Jessica's family received a call from the MS-13 members. Because Ivan didn't have an ID when the members asked, they threatened to harm or kill Jessica's family if Ivan didn't meet them outside. At this point Christian and Jessica "were very scared."

So Christian called the police. He reported the threats and harassment without giving his name. And the El Salvador police responded to his call. A patrol car arrived at the scene, where the officers seized weapons and arrested two gang members.

MS-13 came back, this time asking Jessica's family why they called the police on its members. And the gang blamed the family for the weapon seizures and arrests. So MS-13 told the family to leave their lot by midnight or the entire family would be killed. Alternatively, the gang demanded $700 in extortion money to keep the family safe. The family paid the gang on Christmas Day and has continued to pay extortion money ever since.

The next month, a uniformed police officer with a name badge, Juan Morales, appeared at Jessica's house. Christian, not sure whether to trust the officer, told him that they reported the gang to the police. Trusting Morales proved to be the wrong decision. Morales then demanded $300 from Christian. Again in fear, the family paid Morales as requested.

A few days later, Morales returned without a uniform, demanding another $300. But Christian was only able to pay $150. And soon after, a neighbor told Christian that Morales came "back and shot up the area where Jessica's family lived." Morales threatened to tell the gang what he knew if he didn't get his money.[1] Yet despite these apparent threats, Christian never called the police to report Morales as a corrupt officer. Nor did Christian ever report Morales to any authority in El Salvador.

Instead, Christian fled to another part of El Salvador to live with his mom. But MS-13 followed. As Christian left work one day, two men he believed to be gang members followed him. Soon, Christian got a phone call saying that sooner or later, the gang would find him. MS-13 wanted revenge because of the two arrests that took place on Christmas Eve.

Christian again tried to elude MS-13. He got a new job and new phone number. But the gang members found him. And on another phone call, they said they wanted revenge. Despite the growing number of threats, however, Christian still didn't report them to the police.

Because of MS-13's threats, Christian and Jessica fled to the United States without valid entry documents.[2] And they timely submitted their asylum, withholding of removal, and CAT applications. They believe MS-13 still seeks revenge.

The IJ reviewing Petitioners' applications made many determinations after accepting Christian's testimony as true. Most important among them was that Petitioners failed to prove that El Salvador was unwilling or unable to protect them. The IJ explained that they don't fear

---

[1] The IJ found that the gang already knew what Morales threatened to tell it—that Christian and Jessica called the police on Christmas Eve.

[2] After Petitioners left El Salvador, Christian's mom told Christian that the gang members were still looking for him and threatened his sister. Christian's mom and sister thereafter relocated to the United States.

persecution from the Salvadoran government, nor all its police. Although Petitioners may fear extortion from Morales, more significantly, they fear *persecution* from MS-13—a non-governmental actor.

The IJ next reasoned that El Salvador's police force was willing and able to control the MS-13 gang. After all, the police arrested two members based on Christian's *only* call for help. So, the IJ reasoned, the officers had done their job. And the IJ found that the country-conditions evidence submitted by Petitioners failed to "indicate that the entire governmental police force in El Salvador [was] aligned with the MS-13 gang." In the end, the IJ found that Petitioners didn't prove that the Salvadoran government was unwilling or unable to control MS-13.

After declining to grant asylum, the IJ found that Petitioners couldn't meet the higher burden of proof for withholding of removal. And although "very sympathetic" to the couple, the IJ also denied their CAT claim. The IJ didn't find any evidence that the government of El Salvador would acquiesce to torture by MS-13 or that they would face a particular risk of being tortured. The IJ stated that precedent controlled its decision: "[C]laims based upon revenge or personal disputes are not within the purview of the asylum laws of this country."

Petitioners appealed. And the BIA affirmed the IJ's determination that Petitioners are ineligible for asylum, withholding of removal, and CAT protection. Reviewing the IJ's findings in light of the testimony and country-conditions evidence, the BIA agreed that Petitioners didn't prove that the Salvadoran government was unwilling or unable to protect them from MS-13. The BIA noted that the government arrested gang members the only time that Petitioners called the police for help. And the BIA added that Petitioners didn't report any later incidents to the authorities.

Petitioners timely moved for reconsideration and a stay of removal. And the BIA denied the motions. At the outset, the BIA admitted to one minor error. In its initial decision, the BIA mentioned that it upheld the IJ's "adverse credibility finding" even though no such finding existed. The BIA "did not otherwise address credibility" and affirmed the IJ's denials on other "bases," such as the finding that Petitioners "did not establish that the Salvadoran government was unable or unwilling to protect them." So the BIA dismissed the error as harmless. And it rejected Petitioners' other arguments over factual and legal errors and the failure to consider country-conditions evidence. Petitioners now timely seek review of the BIA's order of removal and denial of reconsideration.

## II.

When the BIA reviews an IJ's decision "and issues a separate opinion, rather than summarily affirming the [IJ's] decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009) (citation omitted). That said, if the BIA adopted the IJ's reasoning, we also review the IJ's decision. *Id.* We review questions of law de novo. *Id.* And we review factual findings of the BIA and IJ under the "substantial evidence" standard. *Hachem v. Holder*, 656 F.3d 430, 434 (6th Cir. 2011). That standard restricts us from reversing findings "simply because we would have decided them differently." *Khalili*, 557 F.3d at 435 (citation omitted). Indeed, we must hold the findings "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (citation omitted).

## III.

Petitioners seek reversal of their denied applications for asylum, withholding of removal, and CAT protection. The key conclusion by both the IJ and BIA is that Petitioners didn't prove

that the Salvadoran government was unwilling or unable to protect them from MS-13. Because substantial evidence supports that determination, we deny the petition for review.

**A.    Petitioners' Asylum Claim**

The Attorney General has discretion under the Immigration and Nationality Act ("INA") to grant asylum to a "refugee." 8 U.S.C. § 1158(b)(1)(A). A refugee is defined as someone "who is unable or unwilling to return to [his] home country because of past persecution or a 'well-founded fear' of future persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Bonilla-Morales v. Holder*, 607 F.3d 1132, 1136 (6th Cir. 2010) (quoting 8 U.S.C. § 1101(a)(42)). And the burden is on the applicant to establish that he or she qualifies as a refugee. *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005) (citing 8 C.F.R. § 1208.13(a)-(b)).

When the persecutors are non-state actors, asylum claims require the applicant to show that the government is "unable or unwilling to control" the persecutors. *K. H. v. Barr*, 920 F.3d 470, 475 (6th Cir. 2019) (citation omitted). To evaluate this element, adjudicators "must examine the overall context of the applicant's situation . . . and review all relevant evidence in the record." *Id.* at 475–76 (cleaned up) (citations omitted). And although this Circuit doesn't have a "clear roadmap" for the "unwilling or unable" analysis, we generally look to two categories of information: (1) the government's actual response to an applicant's persecution when it was reported; and (2) evidence of country conditions. *Id.* at 476; *see Zometa-Orellana* v. *Garland,* 19 F.4th 970, 979 (6th Cir. 2021).

**1.    The Salvadoran Government's Actual Response**

To analyze the actual response of a government, courts review many factors, including "whether the police investigated, prosecuted, and punished the persecutors[.]" *K. H.*, 920 F.3d at

476.  And even if "the evidence is not as strong as the BIA indicate[s]," we will not reverse a finding if the BIA can still "reasonably conclude[] that some of the evidence presented, with respect to the government's response, demonstrate[s] the [] government was not unwilling or unable to control [] persecutors and protect [an applicant]."  *Id.* at 477.

Here the BIA adequately considered factors that weighed strongly against Petitioners.  The BIA found that police seized weapons and arrested two gang members the only time Christian called them for help.  So the BIA, like the IJ, reasoned that the police were willing and able to help.  And despite the police's willingness and ability, the BIA noted, Petitioners didn't report later threats or conduct by MS-13 or Morales.

Because Petitioners didn't report the later incidents to the police, we don't have much more indication that the police would be unwilling or unable to protect them.  Indeed, "no government can protect its citizens from activities it is not made aware of."  *Palucho v. Garland*, 49 F.4th 532, 541 (6th Cir. 2022) (involving petitioners who "never alerted the police about [] extortion" even though they claimed they "fear[ed] that the gangs would retaliate against them—a fear objectively corroborated by the country-condition reports"); *Rosa-Mejia v. Garland*, 854 F. App'x 9, 13–14 (6th Cir. 2021) (quoting the IJ in that case and affirming the agency's decision); *see Reyes Almendarez* v. *Barr,* 817 F. App'x 35, 41 (6th Cir. 2020) (explaining that a petitioner's decision to not "follow up with the police," while "understandable" to avoid further risk of harm, made it "difficult to count the police's failure to arrest and prosecute the perpetrators . . . against the efficacy of the [] government's response"); *Velasquez-Rodriguez v. Whitaker*, 762 F. App'x 241, 243 (6th Cir. 2019) (holding that a petitioner failed to establish eligibility for asylum and withholding of removal in part because she "never reported" physical abuse or threats to "kill her and her daughter" to the police).

So the BIA and IJ only had one police call to consider. And the police adequately responded to the call. Taken "as a whole," the BIA's and IJ's findings are "supported by reasonable, substantial, and probative evidence" such that this Court will defer to their judgments. *Guzman-Vazquez v. Barr*, 959 F.3d 253, 259 (6th Cir. 2020) (citation omitted). Showing that the record compels a reasonable adjudicator to reach a conclusion contrary to the IJ or BIA's is a high burden. And Petitioners fail to meet it.

**2.     Country Conditions Evidence**

The second consideration of an asylum claim is country-conditions evidence. Petitioners claim that the IJ and BIA overlooked such evidence in its analysis. But that's wrong. The IJ and BIA considered all of the evidence before making their determinations.

To begin, the BIA reviewed the IJ's findings for clear error. And the IJ made those findings while "consider[ing] all of the evidence in the record in its entirety, regardless of whether specifically mentioned in the text of [its] decision or not." (21-3784 A.R., at 64.) Indeed, the IJ even listed out Petitioners' submission of "corroborating documents" and "supporting documentation[.]" (*Id.* at 63–64.) And the IJ didn't stop there.

The IJ also specifically noted that the record contained "plenty of evidence regarding the gangs and their violence[.]" (*Id.* at 75, 77.) But even so, the IJ found that no evidence suggested that "the entire governmental police force in El Salvador is aligned with the MS-13 gang[.]" (*Id.* at 77.) And the IJ stated that he did "not want to seem unsympathetic to the conditions of crime and violence in El Salvador[.]" (*Id.* at 78.) He realized that El Salvador is "very, very dangerous for many people who live there," but he noted that "the police are making efforts to combat these violent gang members in that country." (*Id.*)

Next, the BIA acknowledged the country-conditions evidence just as the IJ did. The BIA acknowledged the IJ's findings about "gang violence, crime, and police corruption problems in El Salvador." (*Id.* at 8.) And after considering this evidence, the BIA agreed with the IJ's finding that Petitioners did not establish that the Salvadoran government was unwilling or unable to protect them from their feared harm. The BIA pointed to the IJ's "permissible view of the evidence" that Petitioners' "personal experience with the police [demonstrated that] the police responded, investigated, and offered protection to the aliens." (*Id.* (citation omitted).)

In addition, later in the BIA's CAT analysis, the BIA specifically acknowledged Petitioners' argument that "country conditions evidence indicates that gangs 'act with brutal violence' against those they perceive are opposed to them and that the police are corrupt and relay information to gangs[.]" And Petitioners even concede that the BIA mentioned the evidence in its opinion. (21-3784 Petitioners Br. at 20.)

So no error occurred. The BIA meaningfully reviewed the proceedings—including Petitioners' country-conditions evidence. And it concluded that Petitioners' success in obtaining police assistance in the one instance they sought it undermined the assertion that police would be unwilling or unable to protect them in the future. And regardless, the BIA did not need to "issue an opinion that discusse[d] and rebut[ted] every piece of record evidence that cut[] against its findings." *Palucho*, 49 F.4th at 537–38) (collecting cases). Otherwise, we would issue "a remand in nearly every immigration case because an immigrant [would] almost always be able to identify *some* piece of evidence that the [BIA] did not expressly consider." *Id.* at 538. Moreover, Petitioners only point to the general, country-conditions evidence that the IJ and BIA each considered. Petitioners don't point to other evidence of their personal experience with the police that convinces us that the determinations are otherwise unsupported by substantial evidence. *See*

9

*K.H.*, 920 F.3d at 478 (concluding that poor country-conditions evidence did not suffice to show that the government was unwilling or unable in that petitioner's specific case). So they fail to meet their burden.

Taken "as a whole," the IJ's and BIA's findings of fact are "supported by reasonable, substantial, and probative evidence" such that this court will defer to their judgments. *Guzman-Vazquez*, 959 F.3d at 259 (quoting *Abdurakhmanov v. Holder*, 735 F.3d 341, 345 (6th Cir. 2012)). We may not reverse such findings simply because we may have decided them differently. *Gishta v. Gonzales*, 404 F.3d 972, 978 (6th Cir. 2005). And under the facts, a "reasonable adjudicator would [not] be compelled to conclude to the contrary." *Singh v. Gonzales*, 451 F.3d 400, 403 (6th Cir. 2006) (quoting 8 U.S.C. § 1252(b)(4)(B)). Because Petitioners failed to meet their burden in showing the Salvadoran government was unwilling or unable to control MS-13 and protect them, we affirm the BIA's denial of Petitioners' asylum claim.[3]

**B.  Petitioners' Other Claims**

Petitioners also raise withholding of removal claims under the INA and CAT. Each fails because Petitioners can't meet the claims' heightened burdens. They also assert that the BIA committed due process violations. But because the BIA didn't commit an error that would change its determination, we find no constitutional violation.

The INA mandates withholding of removal if an applicant proves that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). Someone seeking

---

[3] We need not analyze Petitioners' other arguments on how they qualify for asylum because the BIA's dismissal was based on the unwilling or unable analysis. *INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("As a general rule courts and agencies are not required to make findings on issues the decision of which is unnecessary to the results they reach.").

withholding of removal faces "a more stringent burden than what is required on a claim for asylum." *Urbina-Mejia v. Holder*, 597 F.3d 360, 365 (6th Cir. 2010) (quoting *Liti v. Gonzales*, 411 F.3d 631, 640 (6th Cir. 2005), *superseded by statute on other grounds as stated in Marikasi v. Lynch*, 840 F.3d 281 (6th Cir. 2016)). The applicant must show "a clear probability that he will be subject to persecution if forced to return to the country of removal." *Id.* (quoting *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005)). Otherwise said, an applicant must prove that "it is more likely than not" that he or she will face persecution upon return. *Liti*, 411 F.3d at 641 (quoting 8 C.F.R. § 1208.16(b)(2)).

Because Petitioners failed to establish eligibility for asylum, it follows that they "also cannot satisfy the more onerous burden for withholding of removal." *Kukalo v. Holder*, 744 F.3d 395, 402 (6th Cir. 2011) (citing *Kaba v. Mukasey*, 546 F.3d 741, 751 (6th Cir. 2008)); *see, e.g.*, *Bah v. Gonzales*, 462 F.3d 637, 643 (6th Cir. 2006); *Yu v. Ashcroft*, 364 F.3d 700, 703 n.3 (6th Cir. 2004).

Petitioners similarly fail to meet their heavy burden of proof under CAT. To obtain CAT protection, Petitioners must prove "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004) (quoting 8 C.F.R. § 208.16(c)(2)). Although the inability to establish an asylum claim doesn't necessarily preclude relief under CAT, Petitioners face a heavy burden overcoming such a barrier. *Kukalo*, 744 F.3d at 402; *see, e.g.*, *Bah*, 462 F.3d at 643; *Yu*, 364 F.3d at 703 n.3.

In support of CAT relief, Petitioners point to the same evidence as in their asylum application. And they claim that evidence supports a clear probability that MS-13 will torture them or that Morales will report their location to MS-13 for torture to take place. Because they "offer[] no evidence to support such a claim beyond that used to buttress the claim for asylum,"

their assertions "fail[] to compel us to find that [they] are entitled to relief under CAT." *Kukalo*, 744 F.3d at 402; *see Berri v. Gonzales*, 468 F.3d 390, 397–98 (6th Cir. 2006). So we affirm the decision of the BIA to deny Petitioners' claims for withholding of removal and CAT protection.

Petitioners also claim that the BIA denied their due process rights. "Fifth Amendment guarantees of due process extend to aliens in deportation proceedings, entitling them to a full and fair hearing." *Montanez-Gonzalez v. Holder*, 780 F.3d 720, 723 (6th Cir. 2015) (citation omitted). To evaluate whether a violation occurred, we ask whether "a defect in the removal proceeding" caused prejudice. *Abdallahi v. Holder*, 690 F.3d 467, 472 (6th Cir. 2012) (citation omitted). And Petitioners bear the burden of showing prejudice. *Id.* They must prove that "due process violations led to a substantially different outcome from that which would have occurred in the absence of these violations." *Id.* (citation omitted). Here, for the reasons stated above, no error occurred that would have changed the BIA's determination. So the due process claim fails.

## C.     Petitioners' Counterarguments

Petitioners make several challenges to the BIA's determination. Each fail. Although Petitioners correctly point out that the BIA made a mistake in its initial decision, the mistake was harmless. The BIA stated in error that it upheld the IJ's "adverse credibility finding," (21-3784 A.R., at 9–10), even though one didn't exist. But later, the BIA acknowledged the mistake in its denial of reconsideration, finding it a harmless error. (22-3215 A.R., at 8.) And we agree.

Petitioners don't explain how this error caused prejudice or a different outcome in their deportation proceedings. *Abdallahi*, 690 F.3d at 472. In rendering its decision, the BIA relied on the IJ's findings when making its determinations. And the IJ made its findings based on Christian's "very credible" testimony. (21-3784 A.R., at 73.) The BIA didn't question Christian's credibility. Nor did it challenge any of the findings based on his testimony. Instead, the BIA rested its order

on other bases altogether, including that Petitioners didn't prove that the Salvadoran government was unable or unwilling to protect them. So the BIA's error is harmless.

Petitioners also assert that the BIA messed up the facts. They claim that they tried to get police assistance twice, not once. First, on Christmas Eve (when the first incident with MS-13 took place). Second, a month later from Officer Morales (when he dropped by their doorstep unexpectedly). Indeed, Petitioners even say that the BIA overlooked Officer Morales's conduct altogether. But the BIA considered the incidents involving the police. (21-3784 A.R., at 9). It noted that the government "responded and arrested 2 individuals" after Petitioners sought help on Christmas Eve. (*Id.*) And it didn't forget that Petitioners were "extorted and threatened by a corrupt police officer." (*Id.*) Yet more importantly, it noted that Petitioners didn't "report these subsequent incidents to the authorities." (*Id.*) No error occurred.

Petitioners next challenge the weighing of Christian's testimony. They assert that Christian's testimony establishes that they can't rely on the police for help because of their fear of dealing with corrupt officers like Officer Morales. They add that the initial call to the police led to Officer Morales extorting them, which they allege proves that the Salvadoran government cannot control MS-13. But the IJ and BIA considered all the evidence that Petitioners offered and made a reasonable finding based on that evidence. Relying on Christian's testimony, the BIA reasoned that the only time Petitioners asked for help, they got it. And it added that despite the police's previous willingness and ability to help, Petitioners did not call the police to help with the

later incidents. Based on these facts, we cannot find otherwise even if we "would have decided []

differently." *Khalili*, 557 F.3d at 435 (citation omitted); *see Palucho*, 49 F.4th at 541.[4]

Petitioners also assert that Morales acted as a state actor when he extorted them and later

fired a gun in their neighborhood. To clarify, Petitioners fear persecution by MS-13, not Morales.[5]

And MS-13 is a non-governmental actor. Pointing to Morales' conduct, Petitioners reason they

cannot rely on the government to protect them. But we have rejected similar claims that potential

"corruption in El Salvador [will] prevent them from seeking protection from the police" when "the

record show[s] how police officers assisted the family immediately following" a call for assistance.

*Rosa-Mejia*, 854 F. App'x at 13. That a single rogue police officer was corrupt doesn't mean that

the whole government was corrupt. And Christian even admitted that not all police officers in El

Salvador are corrupt. (21-3784 A.R., at 67.) Indeed, he acknowledged that Salvadoran police

arrest gang members. (*Id.* at 68, 77.)

Petitioners last argue that the BIA improperly applied the "unwilling or unable" standard.

They would have us flip the burden and heighten the standard. In their view, asylum applicants

---

[4] Relatedly, Petitioners argue that the BIA failed to review the findings based on Christian's testimony under a de novo review. But the testimony was not a legal conclusion. Instead, the BIA had to review the findings for clear error. 8 C.F.R. § 1003.1 (d)(3)(i). And it did. (21-3784 A.R., at 7.)

[5] Petitioners cite out-of-circuit precedent for the proposition that Officer Morales can be considered a state actor who could persecute them. *See Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1086, 1088 (9th Cir. 2005) (involving persecution by a "high-ranking police officer"). True enough, we can consider government actors responsible for a persecution. *K. H.*, 920 F.3d at 475. But that's not the situation here. Petitioners don't fear persecution by the Salvadoran government. Nor do they fear persecution by Officer Morales. Instead, they fear it by MS-13 members—who are non-governmental actors. As a result, the IJ and BIA considered Officer Morales' conduct to the extent that it proved that the government was unwilling or unable to control MS-13. And the IJ and BIA found that the government corruption by one individual didn't mean that the government as a whole was unwilling or unable to control MS-13, especially when considering the police's prior arrests and weapons seizure.

should be able to stay in the United States unless an IJ finds that a foreign government can guarantee their safety. But that's not how asylum claims work. Instead, Petitioners have the burden of showing that they could not "reasonably expect the assistance of the government" in controlling the perpetrator's actions. *Juan Antonio v. Barr*, 959 F.3d 778, 793 (6th Cir. 2020) (quoting *Al-Ghorbani v. Holder*, 585 F.3d 980, 998 (6th Cir. 2009)). And Petitioners failed to meet their burden. From what the IJ and BIA had in front of them, no country-conditions evidence proved that the Salvadoran government was unwilling or unable to control MS-13. And again, the police showed its willingness and ability to arrest gang members soon after Christian's only call for help. With that in mind, the IJ and BIA didn't err.

## IV.

We next address the BIA's denial of Petitioners' motion for reconsideration. We review a denial of that motion for an abuse of discretion. *Wajda v. Holder*, 727 F.3d 457, 462 (6th Cir. 2013) (citation omitted). To determine whether an abuse of discretion occurred, we ask whether the denial "was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." *Id.* (quoting *Allabani v. Gonzales*, 402 F.3d 668, 675 (6th Cir.2005)).

Petitioners claim that the BIA's denial of reconsideration "perpetuated the same errors it committed in its initial decision." (22-3215 Petitioners' Br., at 6.) Petitioners again point to the same arguments: the BIA's harmless error of mentioning a credibility determination, alleged factual and legal errors related to the "unwilling or unable" standard, the consideration of country-conditions evidence, and alleged errors in CAT analysis. All arguments fall short.

As we explained above, the BIA's prior decision was supported by the record and its legal conclusions tracked the decisions of this Court. Because Petitioners failed to show that the BIA

made any legal or factual errors in reaching its initial determination, the BIA didn't abuse its discretion in denying the motion for reconsideration. *See Mu Ju Li v. Mukasey*, 515 F.3d 575, 578 (6th Cir. 2008) (citing 8 U.S.C. § 1229a(c)(6)(c) and explaining that "[t]he purpose of a motion to reconsider is the correction of legal or factual errors that occurred in the BIA's original decision").

**V.**

For these reasons, we deny the petitions for review.